## W. M. LEONARD v. THE STATE.

### No. 4039. Decided May 26, 1909.

**1.—Theft—Conversion—Evidence—Allusion to Former Conviction—Flight.**

Upon trial for theft where the State introduced testimony with reference to defendant's escape pending said charge, and during said testimony the State's witness remarked that he was holding defendant because he had been convicted (which seemed to have been a casual or inadvertent remark), and the court in-structed the jury to disregard this remark of the witness, there was no error.

**2.—Same—Charge of Court—Bailment—Robbery.**

Where upon trial for theft by conversion, the evidence showed that the defendant arrested the party injured and placed him in jail for drunkenness; that he there searched him and took from him among other things one hundred and fifty five dollars in United States Currency, which he failed to return or account for; that defendant was acting as a deputy constable at the time, and that it was the universal custom upon arresting prisoners and placing them in jail to search them and take from them valuable things that they might have about their person, the court correctly charged the statute of conversion under bailment, and correctly refused a requested charge on the law of robbery.

Appeal from the District Court of Bowie. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of theft by conversion; penalty, two years confinement in the penitentiary.

The opinion states the case. The indictment followed the form prescribed in section 1501, White's Penal Code.

*Rodgers & Dorough,* for appellant.—On question of bailment: Malz v. State, 36 Texas Crim. Rep., 447; 37 S. W. Rep., 748; Livingstone v. State, 38 Texas Crim. Rep., 535; 43 S. W. Rep., 1008, and cases cited in the opinion.

*F. J. McCord,* Assistant Attorney-General, for the State.—On question of bailment, robbery and theft: Skipworth v. State, 8 Texas Crim. App., 135, and cases cited in opinion. On question of flight: Russell v. State, 38 Texas Crim. Rep., 590.

DAVIDSON, Presiding Judge.—Appellant was indicted and convicted of theft by conversion of the property of one L. F. Dickson, his punishment being assessed at two years confinement in the penitentiary.

The evidence discloses that Dickson was enroute from Tennessee to some point in Texas. When he reached Texarkana it became necessary for him to change trains. He went to the depot where he expected to take an outgoing train for the point of destination. He was accompanied by his wife and children. After getting his wife and children to the depot he concluded that he would try to find a friend who resided in Texarkana, and for this purpose left the depot. He made inquiries at a saloon nearby, and upon leaving the saloon was taken in charge by one of the officers who claims he placed him in jail for being drunk. The facts show Dickson was not drunk, but on account of some peculiar affliction walked at times as if he was intoxicated. Among other things, he desired also to make inquiry as to the time of the arrival from Memphis of the next incoming train. Dickson testifies at this point that he went over to a saloon in which he saw a light and asked a gentleman who was in there when the next train from Memphis would arrive and was informed about five something in the morning. He turned to return to his wife and children and had gotten half way from the saloon to the corner leading up to Broad Street when appellant accosted him

and asked, "Where are you going? Wait a minute and I will go with you," or some such remark. Witness replied, "All right," and walked on. Appellant said, "Come on and go with me," and witness replied, "All right," and went on until they got to the corner. Witness then said, "My wife and children are over here at the depot and I had better notify them about it because I would not like to go and select a place unless they would approve of it." Appellant replied, "We will attend to that all right," and just chuckled to himself. Witness says he did not mistrust anything then and turned at the corner starting towards Broad Street and said, "My wife and children are here at the depot." Appellant said, "That is all right." Witness insisted on going back and said, "What does this mean?" and appellant said, "You know," and witness said, "Show your authority," and appellant replied, "That is no trouble to do," and turned back the lapel of his coat, and witness said he saw that he was up against it, and said, "What have you got me charged with? What have I done?" Appellant just laughed. Witness demanded a reason for his arrest, but appellant never told him from the time he arrested him until he placed him in jail. Just before reaching Broad Street appellant called a man by the name of Levy to assist him. Appellant made a motion and said help or something like that. Witness says he was a little deaf and heard nothing but the word "help." Levy took witness by the left arm, appellant being on his right side, as he had been from the first time he approached him. They took witness to jail and searched him. They took his pocket-book and some letters, testimonials and certificates, etc., and his watch. Witness said, "I think I said, speaking to Leonard, 'You notify my wife and children. The baby is not real well. They are down there at the Union depot and my wife is expecting me back. I promised to be back in twenty minutes from the time I left and the time was almost up when you overtook me.' Appellant said, 'I will attend to that all right,' and Levy said, 'Hadn't we better get the justice of the peace down here and have this fellow's trial and let him submit tonight?' Appellant said, 'No, he is probably in bed and we will just put him in here and let him stay until morning.'" Appellant and Levy searched the witness and took his money. While appellant was searching the witness, these remarks and the conversation occurred: Witness had $3.60 in a little purse in his right hand pants pocket. He had $155 in his left pants pocket. He says he had his hand on his wallet when appellant arrested him and that he kept it there until appellant made him withdraw his hand. Appellant asked, "What have you got there?" Witness says, "That is my other money." Witness said he informed appellant that he had some money when he was searching him. The searching occurred at the jail door in the presence of Levy. Levy took the money and poured it out of the little purse and counted it, same amounting, as he thought, to $3.50, and witness said, "There is only $3.50 there." And he said,

"No, there is $3.60," aud turned back a half dollar and there was a dime under it which had not been seen by witness. The left hand pants pocket was the last pocket he searched, and in it was the little wallet containing $155. Appellant said, "Take your hand out," and put his hand in witness' pocket and felt the wallet and took it out and said, "That is about all." The last remark this witness said he made to appellant was, he begged him to notify his wife that he was there as she was expecting his return. He was locked up in jail. Leonard took the $155 out of the left hand pocket, which was in the drawstring wallet tied hard, and $3.60 in a little purse, which he got out of witness' right hand pocket. Witness says he was not drunk and had only taken one glass of beer at the place where he called to make inquiry about his friend, Mr. Edward. The $155 was paper currency, lawful money of the United States of America. Appellant did not open the leather wallet in his presence and never took the money out and counted it, but saw it was a package of some description, and put it in his pocket. This occurred about nine o'clock p. m. and after the Iron Mountain train came in. Witness says he had gotten off at the Cotton Belt depot and transferred to the Union depot so that they would be ready to go to Bagwell. Witness had made some inquiries of hack drivers around the Union depot with a view of ascertaining where he could get some cheap reputable place to stay all night, and they had told him about a place or two, and when appellant called witness thought he was going to show him a place where he could stay. Upon arriving at the jail Levy stood at the door and appellant in front of witness, and searched him and took the property. Some two or three hours after the arrest appellant returned to the jail with a man whom witness had never seen before, and appellant told witness that this man would pay his fine if he would submit and that he could then go back to his wife and children. This the witness refused inasmuch as he had done nothing subjecting him to a fine, but requested that appellant should let him go and return him his money for which he would express thanks. Appellant then denied getting the money except the $3.60. Witness spent the night in jail and the next morning was taken before the justice of the peace on charge of drunkenness. The charge was dismissed, whereupon he asked for the return of his $155 and appellant denied taking it, and returned the other things except the $155. Witness' wife corroborates him as to the amount of money and some of the other matters in regard to his leaving depot in search of his friend, etc., and said she did not see her husband any more until the next morning after his leaving the depot. She saw appellant that night, however. He came to the depot where she and her children were about two hours after her husband left, and informed her that he had her husband locked up in jail for being drunk. She says her husband had not taken anything to drink up to the time he left her and was not under the influence of liquor

at the time he left her. Appellant informed her that he had four dollars that he had gotten off of her husband; she did not ask him about the money. He informed her that if she desired to go to a hotel he would take her. She replied that she had no money to go to a hotel, and appellant replied that he had four dollars that he got off her husband, and she said, "Is that all the money you got off of him?" He said, "Yes." She said, "He had more money than that on him." He said, "He didn't have any more when I got hold of him," and told her that her husband was drunk. She asked him what he locked him up for, and appellant said because he was drunk, and she said, "It is not my husband, for he don't drink." Appellant said he was drunk, and witness said, "How came you to know I was here?" and he replied that her husband told him, and she said, "How could he tell you and him drunk?" She said, "The other man that was with him said that he was so drunk when he was arrested that he could tell nothing. Appellant asked her, "Are you going to a hotel?" She said, "No, sir, I am not." Appellant said, "You can stay here then." He talked rather independently to witness. She said that she informed appellant that her husband had a kind of stagger and appellant laughed, and witness said, "The doctor said that it is his balancing power that he can not control." Appellant kinder laughed and told her it was her husband he had locked up. Witness said she did not believe it and appellant took out of his pocket a letter or two and asked witness if she knew that letter, and she said she did; that her husband had had the letter in his pocket when he went off. It was a letter that her husband had received from Blooming Grove. She then gave a detailed statement in regard to the amount of money and matters of that sort showing a thorough familiarity with her husband's business and the amount of money he had, etc. This witness stayed with her children at the Union depot during the night, and the next morning a gentleman came to the depot and took them to the justice court. Her husband was there and was released. He demanded his money and appellant claimed that he only got $4.06 off of him. Her husband then told Leonard (appellant) that he took the wallet containing $155, and appellant denied it. Levy, the man with appellant at the time of this occurrence, testified that Leonard asked him to assist in carrying Dickson to jail. That Leonard had Dickson by the right wrist and arm and he, Levy, took hold of him on his left side in the same manner. That he did not have his left hand in his pocket. They carried him to jail and Leonard searched him and took from his right hand pocket a purse containing $3.46 and a few other little things, and also took from his coat pocket some letters, and took out of his left pants pocket 60 cents in small change. As appellant would take the things from Dickson he handed them to witness, according to his testimony. He said he did not see appellant get the little wallet out of Dickson's left hand pocket. He then locked Dickson up in

jail and went away. He was also with Leonard at the time that he went to the depot. His testimony is not materially different from Mrs. Dickson at this point. Appellant testified in his own behalf that he saw Dickson on the corner of Maple and Front Streets, standing on the edge of the sidewalk, leaning against a post. Witness was on Broad Street, and he noticed as he, Dickson, started away that he was staggering, and he, appellant, went after him. Dickson went due east, towards Cosmopolitan Hotel; he was going down the street, right down the middle of the street. That he was not out of sight of appellant until he went into John Mayher's saloon. Dickson came out of the saloon about three steps before appellant reached the door staggering, and appellant took hold of him as he came out by the right arm. He says that Dickson did not ask him why he was being arrested until they reached a point near the jail, and said very little at all. Appellant says he arrested him and told him that he wanted him either to get off the street or go to bed, and said, "I expect I had better carry you and put you to bed." Dickson said, "All right," and started on to jail with him. From the time appellant put his hand on Dickson until they reached Broad Street he did not say anything to him about having any money. When first arrested Dickson's hand was hanging down, but he put it in his pocket about half way between the Bank saloon and Broad Street. He did not keep it there because appellant made him take it out, as he did not know but what Dickson had a knife or gun or something and he did not want to get hurt, and that was the reason he made him take it out. On reaching Broad Street Dickson pulled back and did not want to go. That he still staggered or reeled. About fifteen or twenty feet before reaching Broad Street he called for help. He called the witness Levy, he being the only one in sight. Levy went with him, having hold of Dickson's left arm and hand. Dickson never put his left hand back in his pocket from the time appellant told him to take it out. He says when he searched Dickson he got $3.46 out of the little purse from the right hand pants pocket, and feeling in the left pants pocket he got 60 cents. Says he felt in there because he was searching him all over and that he had nothing else in the left hand pants pocket. He denies getting the $155 or any such amount and denies that Dickson had any such amount of money on him. He says that $4.06 was the total amount he got off of Dickson. This money he gave to Mr. Hargett, the constable, under whom he was working as deputy, and Hargett gave it back to Dickson. He then relates matters about returning to the depot sometime later on during the night and informing Mrs. Dickson of the fact that her husband was in jail, etc. There was evidence introduced through the witness Hargett that he, Hargett, had been a peace officer for many years in Texarkana. That when he arrested a prisoner and put him in jail he always searched him and took everything of value from him and all weapons. That this was a

universal custom among all officers at Texarkana and everywhere else. That when he appointed defendant his deputy he instructed him to do likewise. Appellant also testified it was his custom to do so, and that he always did it and that he had been a peace officer in Texarkana for several years, and that this custom was universal with all officers. Dunn and Walker, of the police force in Texarkana, and who had been peace officers in various cities and counties in Texas, testified that this was the universal custom among peace officers everywhere. There is testimony also of the fact that when appellant was confined in jail prior to this trial he escaped and went from New Boston, the county seat, to Texarkana. The officers of Texarkana being informed of his escape, went to and searched his house. After searching about various rooms, they finally in one of the rooms discovered a wardrobe. It being dark, they could not see in the wardrobe and one of the officers placed his hand inside and felt Leonard and called him out and rearrested him. This is a sufficient statement of the evidence to review the questions suggested for reversal.

1. It is contended that the evidence in regard to the escape was inadmissible, and to support this objection a bill of exceptions was reserved. During the particular part of this testimony to which exception was reserved was the following language of the witness: "I was holding him because he had been convicted." The basis of this objection seems to be that it was an allusion to his former conviction. The court signs this bill with the qualification that, "This answer of the witness was wholly unexpected by the district attorney or anyone else. We all expected the witness to answer that he was holding the defendant on this charge and none other, when he escaped." Objection was also urged in this same connection to what the witness Hargett testified in regard to the assistance he rendered in the recapture of defendant, and what was done and said at the time of the recapture. Hargett testified that he learned early on the morning of February 2, 1908, that Leonard had escaped from jail, and he went to his house to look for him. That in company with Peters, who is now dead, and who at the time was deputy sheriff, he went to Leonard's home. That he went to the front door and Mr. Peters went to the back door. That he knocked at the door and Mrs. Leonard, wife of defendant, opened the door. In the hall he noticed a suit case, but did not know what was in it. He went in the front room and found no one there; went in the next room and did not discover Leonard; went in the third room and in this room was a closet. That he went to the closet and on feeling on the inside he discovered Leonard partly dressed. Leonard was hid in the closet. Witness told him to come on out, which he did, and laughingly said, "If you had waited an hour or two you would have found me down on Broad Street," which is the principal business street of Texarkana. It will be further noted in regard to the statement that he was "holding Leonard because he had been convicted," that same

was withdrawn by the court from the consideration of the jury and they were instructed to disregard it. We deem it unnecessary, as the matter is presented, to discuss it. It is not of sufficient importance to require a reversal of the judgment.

2. The court charged the jury, among other things, that if they should find from the evidence that appellant took $155 in current money of the United States of America, etc., and that said money had come in possession of and under the care of said defendant under a bailment to the effect, as follows: "That said defendant herein had arrested said L. F. Dickson and had him in his custody charged with the violation of a penal law of the State of Texas and took said L. F. Dickson to a jail and put him therein and locked him up, and then and there took from the possession of said Dickson and into the possession of himself, the said defendant, the said sum of one hundred and fifty-five dollars in money, and that said defendant was acting, at the time, as deputy constable of precinct No. 1 of Bowie County, Texas, and that defendant had said money in his possession as above set forth and after getting such possession of said money in the above manner, on the 6th day of November, 1907, without the consent of said L. F. Dickson, fraudulently converted the same to his, the said defendant's, own use and benefit, with the intent to defraud said L. F. Dickson of the value of said money, then you will find the defendant guilty." Exception was reserved to this charge, and in this connection special charge asked, in substance, as follows: Gentlemen of the jury: You are charged that the State having alleged in this case the offense of theft by bailee it devolves upon the State to prove such an offense by the evidence to your satisfaction beyond a reasonable doubt.

"By 'bailment' is meant the voluntary delivering of property by one person into the care and custody of another person, upon a contract, express or implied, upon the part of such other person to return it.

"Therefore, if you believe from the evidence, or have a reasonable doubt as to such fact, that the defendant without the consent, or under such circumstances as duress or arrest, as justified the prosecuting witness, L. F. Dickson, in thinking that a refusal or resistance would be useless, took from the possession of him, the said L. F. Dickson, $155, or any sum over $50, then you will return a verdict of not guilty.

"In other words, in order to find a verdict of guilty under the offense charged, you must believe beyond a reasonable doubt that the prosecuting witness, L. F. Dickson voluntarily delivered to the defendant, uninfluenced by fear, duress or arrest a sum exceeding $50, upon a contract, express or implied, on the part of him, the said W. M. Leonard, to return the same." This charge was refused. It is urgently insisted the property was taken by such amount of force as brings it within the term of robbery and within the authority

of Tones v. State, 48 Texas Crim. Rep., 363, and, second, that under no aspect of the case does the facts show a bailment, and that the evidence nowhere brings the appellant within the . purview of the statute which denounces the punishment for conversion as bailee. We are of opinion that the evidence is not sufficient to show robbery, and the facts do not bring it within the rule laid down in the Tones' case, supra. An inspection of the two cases, we think, demonstrates this without going into a discussion of the facts in this respect. It is the universal rule that a bailment may be constituted either by express or implied contract, and it is equally a universal rule that a bailment may arise from quasi or constructive contracts. See 9 Cyc., p. 243. This language is found in the last cited authority: "The term 'implied contract' has also been applied to a class of obligations which are imposed or created by law, without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu. These obligations, however, are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy. They are described by the term 'quasi' or 'constructive' contracts." A great number of authorities are cited in the notes to the above quotation in support of the doctrine, and we think the proposition is correct. There is another rule equally well recognized, as follows: "An action for money had and received will lie where one has obtained money from another by oppression, imposition, extortion or deceit; and the law implies a promise from such person to return it to the lawful owner, whose title to it can not be annulled by the fraudulent or unjust dispossession." See 27 Cyc., p. 863. In support of this, many cases are cited in the foot notes, too numerous to be collated in this opinion. It is again said, in the same volume, at page 866: "Money paid under protest may be recovered back in an action for money had and received, and this form of action lies for the recovery of money obtained through fraud, duress, extortion, imposition, or any other taking of an undue advantage of plaintiff's situation." It may be, we think, safely asserted as a correct rule, that, where money has been obtained from another, even where it has been done through fraud, misrepresentation, deceit, etc., that there is a bailment. This, as stated, arises from the reason and justice of the matter. Three propositions may arise: (1) Where force is used, as in Tone's case, *supra,* there could be a case of robbery. (2) Where the goods were taken fraudulently, or with a fraudulent purpose, without the necessary force to constitute robbery, with a fraudulent intent at the time that it is taken, it would be ordinary theft. (3) If rightfully taken, or what the taker believed to be rightful, or taken without the then purpose of fraudulently appropriating the property to his own use, and subsequently the taker does conceive the fraudulent intent, and does then appropriate it, it would be theft by conversion. Under the facts of this case the first proposition—that is, ro

bery—we think, is not suggested. The facts in the case might constitute ordinary theft, but no question is raised in regard to that matter; no charges were asked, and no point made in the court below, and, therefore, under article 723, that question will not be discussed. If appellant had the fraudulent design, at the time he took the money from the prisoner's pocket, to then appropriate it, it might be, and doubtless would be, ordinary theft, but the facts, we think, are ample to show a conversion or theft by bailment. Appellant took the money under the State's evidence, and converted it to his own use. His testimony is uncontradicted, and from several peace officers, to the effect that it is the universal custom, upon arresting prisoners and placing them in jail, to search them, and take from them even valuable things that they might have about their person, and whether this be legal or not it is unnecessary here to discuss, but it suggests the question as to whether or not, under those circumstances, there was a fraudulent intent at the time of taking the prisoner's effects. If the officer, in taking the property, had no fraudulent intent at the time, it would not be ordinary theft, for there would be wanting at the time a fraudulent intent, but if there was wanting a fraudulent intent at that time, then it would not be ordinary theft. If, however, at the time the property was taken, under those circumstances there was no fraudulent design, but after securing possession of the property a fraudulent intent was formed and a conversion had, it would be sufficient to constitute the taker guilty under the statute of conversion under bailment. We are not here discussing any of that character of cases where the law imposes an obligation upon an officer to receive money, and he subsequently converts it, for we have statutes which control that character of case.

We are of opinion that, under the facts of the case, the evidence is sufficient to justify the court's charge that it is correct, and, so believing, we are further of opinion that the court did not err in refusing the requested instructions. The matter was sufficiently presented by the court's charge.

Finding no reversible error in the record, the judgment is affirmed.

*Affirmed.*

Brooks, Judge, absent.